Okay, can you hear us on the video? Yes. And you can see us okay? Yes. Okay, opposing counsel, can you see the screen from where you are? I can. Okay, great. I interrupted you a minute ago. Were you just trying to launch into your argument or were you trying to tell me something? I'm sorry, were you speaking to me? We're ready for your argument. All right, thanks. Okay, all right. Good morning. Good morning. May it please the Court. Joseph Socher for the appellant and plaintiff in this matter. The plaintiff in this case, Dolores Calderon, was a long-term employee. She had been performing her job following her injuries under restrictions for a number of years. Counsel, it would help me, at least speaking for myself, if you would say these are my strongest claims and this is the evidence you'll find in the summary judgment record that will support that there's a genuine issue of material fact as to those claims. Could you just quickly summarize that, at least for me? I would appreciate it. Sure, thank you. So I think the strongest point here is the disability discrimination claim. But the point is the claims in this case are really all very intertwined. It's hard to separate them. But I think the key point here is the timeline of events. So your strongest claim is? Well, I would say the disability discrimination claim. Okay. Because what happens is that in the timeline of events, she's going along doing her job, nothing is happening, and then the clinic goes into this mitigation status.  So the mitigation status meant that their needs changed or their requirements changed or there's financial issues going on. But the witnesses, including Hayden and others, said, no, there was no financial issues. COVID had nothing to do with it. Financial issues had nothing to do with it. That was not the issue. The issue was when Hayden came in as part of the mitigation process, he saw there were two disabled employees there, and he said, my hope is we can make the case that the business can no longer support these accommodations. That on its own showed what the intent was. He didn't say, well, oh, we've got the disabled employees, let's see how we can accommodate them or let's see, you know, how we can work things out for them or let's see if we can find another position for them that works within their company. He said, let's see if we can say we can no longer support these accommodations. That on its own tainted everything that came after it. And then in terms of so that, first of all, that's, I believe, at least a reasonable juror could find that that is direct evidence of discriminatory intent, that he said that he did not want to accommodate the disabled employees anymore. Is that direct evidence or is that circumstantial evidence? Because it seems to me you have to draw an inference from it. And if you have to draw an inference under our precedence, that's circumstantial evidence. And it would be treated differently under the test. Well, I would say two points to that. I believe that I would argue that it is direct evidence of discriminatory intent. Because he is saying we do not, I don't think it takes any inference to say we no longer want to accommodate these employees. And I'd also point out that under California president, and I apologize, I don't have the case on the top of my head, but I'd also point out that under California president, there is a distinction between disability discrimination and other forms of discrimination in the sense that other forms of discrimination, there's language of animus that in terms of attentional discrimination requires animus on the protected category. But there is California authority, and I can provide it to the court after the argument if it's desired, that disability discrimination does not require animus, it merely requires a decision that's intentionally based on the employee's discriminated status. So I would argue that that statement was and is direct evidence of discriminatory intent. And then once that happens, then that taints everything that happened after it because, for example, the interactive process. Well, if your goal going into interactive process is I'm hoping to make the case that we won't be able to find an accommodation for these people or say we can no longer accommodate them, then that's no longer good faith process because the good faith process is supposed to say we're hoping to find an accommodation that we can do for these people. And then in terms of the good faith process, there's also a lot of the fact that there was no real good faith process also goes back to support the disability discrimination claim because there was never any direct communication between the employer and the employee on how and what sorts of accommodations that they could do for her before they terminated her. Does it matter if the interactive process could not have led to another job, for example, because there were no vacant positions for which she qualified? Would it have mattered under the law? So concededly, if there was really no possible accommodation for her and no that would be an issue for her. However, I would say that as the moving party on summary judgment, the defendants would have to prove that there was no possible accommodation, there was no other jobs. And here, there was really very minimal evidence of that. And this is a company that has many other clinics. And basically, it was just the only evidence of finding another job was that maybe one person made a couple phone calls. There was no list of other possible jobs produced. There was no. And there was also the issue of would, according to the testimony, she would not have received any kind of preferential treatment in looking for another job, which is a requirement of the law. So I think. Uh-oh. Counsel, you're the. Are you having trouble with the video on your end? I just realized that I think it was frozen for about a minute. Not on our end. We can see you just fine. Oh, okay. Okay, go right ahead. Counsel, the district court seemed to place a great deal of stock in Ms. Calderon's deposition where she was asked specifically, can you do the, are you capable of fulfilling the job description? And her answer was very straightforward. She just said no. Now, why isn't that sort of the end of this? Well, Your Honor, obviously, that's not our favorite part of the deposition. I appreciate your candor, Counsel. But I would say a couple of things in response to that. First of all, even if she couldn't do the clinical technician job at that time, you know, in all its aspects, there still was an obligation to try to find another job for her and to give her preferential treatment in finding another job. Now, they did communicate with her a couple of times and give her a letter, and I think maybe there was a second email in which they said, look, you've got three options, and here are your options. And they included finding, you know, being placed at another facility. And I believe that there were other facilities that were identified. They were just much too far away from where she lived to be a realistic possibility for her without relocating. Go ahead. Well, excuse me. So, you know, there's – that letter was really more of an ultimatum than an offer. There was no back and forth or communications about it. There was no – they never provided her with, like, a list of – you know, I've handled other disability discrimination cases where, you know, a big company like the one here, you know, provided a list of available jobs. They never, you know, they never assigned – they never said, hey, talk to this HR person. It's her job to try to find, you know, other jobs. It's all kinds of things that companies typically do to try to find alternative positions for disabled employees that were not done here. And in terms of also of that – what the court and – the district court and the defendants described as an admission about doing the job, I think, you know, there's a lot of deposition testimony aside from that where she talks about how she did do her job for years before she was terminated. So I don't – I think that taking that one line, which I also continue to contend, was a confusing question with lots of different qualifications in it. So the initial – It's out of context. Counsel, the initial email to Ms. Calderon giving her the options is March 18th. It tells her that her last day will be the 20th. So two days later, it gives her the three options. Options two and three are to apply for a leave of absence or apply for permanent disability. Option one is find a clinic in the area that's able to accommodate your work restrictions. That's pretty minimal coming from the office. However, there is a phone number here and says, look, we're sorry we have to do this. Please contact us, and you can contact the Employee Service Center and gives her a phone number. Did she ever call the service center? Is there any evidence that she ever made a phone call? Does she have any obligation of inquiry here, or is it their obligation to come forward with jobs for her? Well, I believe the law is that they have to make affirmative efforts to find her another job. Merely giving her a phone number to call is not sufficient, and I believe that's cited in the evidence, that case law is cited in the opinion. And she doesn't have to follow up with any kind of a phone call if it's offered to her as an accommodation? Well, I mean, obviously it would be better if she did make a call, and I believe there was deposition testimony that she called a couple clinics. I don't recall if there was deposition testimony regarding that specific phone number. There was deposition testimony that she had called a couple clinics. Is there any evidence in the record as to where the closest affiliated clinics were? I recall there being deposition testimony of her calling clinics within the San Fernando Valley, but I can't recall the citation. I'm sorry, where was it? I believe it was in the San Fernando Valley. And how far away would that have been? As I recall, it would have been within an hour, but I don't have the citations offhand. But that's what I recall. Counsel, do you want to reserve the remainder of your time? I would, thank you. Okay. Good morning. Joel Rice on behalf of the defendants' appellees. The district court's grant of summary judgment here should be affirmed, and it can be affirmed basically for a two-part reason that really disposes of all the disability claims. Number one, plaintiff was not qualified to perform the essential physical demands of the patient care technician position. And number two, there was no reasonable accommodation as of March 2020 that would have enabled her to perform that job, and there was no vacant position identified to which she could be transferred. So she was very straightforward, as Judge Bybee indicated, that she couldn't do the job. It was a complicated question, but I don't see in the deposition as presented, but I don't think that point is really disputed here. But I think her contention is that accommodation had been made for some time. Is that a fair summary? Well, she's argued that, but we disagree. The history here is, and this is not disputed, she was in the past, managers were allowing her to have other technicians come over and do part of the physical duties that she should have been required to perform. Right, and that's why I'm summarizing it, maybe not very artfully, I'm summarizing this. I don't think that's disputed, that she really couldn't do the job in full in that sense. But is it your contention that this workaround that you've just described, which is my reading of the record as well, is not an accommodation? It is an accommodation, but not a legal accommodation in the sense that it is absolving her of some of her essential duties. Well, I don't really know what that means in terms of, what do we do with it in our decision trees, or was that an accommodation? Because your position then is, of course, the financial circumstance of the operation changed and it was no longer possible. If I treat that as an accommodation, as a term of our accommodation, they're letting other people do parts of her job and assist her. If I were to treat that as an accommodation in the legal sense, then what happens with the decision tree? Here's what I would say, Your Honor. Okay. It's not an accommodation. Well, that's why I'm trying to figure out what your argument is. A reasonable accommodation is something you do, either modifying the job in some fashion or adjusting the schedule or some other aspect that enables the person to perform the essential functions of the job. But your position is she really wasn't performing the essential functions because somebody else is doing part of it for her. Correct. I think we have case law on this, but I'm not sure. What if coworkers step in and do function X and they're happy to do that and nobody's complaining and they want to continue in that vein? What would we do with that? Again, if somebody is taking over some of the essential duties, again, that's not an accommodation. Now, an employer could do that for somebody if they wanted to, but the law in California doesn't require you to do that. And in 2020, when the clinic was unprofitable and Mr. Hayden came in and was looking with a gimlet eye at all the operations and where they could be more efficient, he realizes, wait a second, we've got this lady who's supposed to be a patient care technician and she can't do many of these physical functions that are essential. She can't stand for long periods of time. She can't lift anything heavy. She can't bend over. She can't stoop. That's basically all of what patient care technicians do. At that time, opposing counsel thinks that because of this statement, my hope is that we can show the business no longer supports these accommodations. I paraphrase that a little bit. His position is that raises a question of fact. So one question I have about the timeline is, as of the time this transition occurred in management, as of that time, how long had she been performing the job with the assistance of other workers? Well, she was off and on on the job, so I can't tell you precisely. I mean, her workers' comp injury was back in 2015. Initially, her restrictions were not as severe. The applicable restrictions here were communicated in the fall of 2019, just a few months before. That's when the doctor said nothing more than 10 pounds, no extensive standing, no bending, no stooping, no crawling, no crouching. Those restrictions were not in place before. So it's relatively recently that she was under these very strict restrictions. After she got those restrictions, she spoke to the manager, Mr. Akram. I'm sorry, Ms. Akram. I apologize. And they had some conversations about it. But at that point, all they could do was have other technicians at times cover some of these physical duties. Or, and this is something Akram found out, and this plaintiff had been doing for years, she was just working outside of her restrictions, just doing things that were in violation of her restrictions. And when Hayden came in... Physical restrictions. Correct. And when Hayden came in, he said, number one, we have to be operating toward patient care here. Patient care technicians have to be able to do these essential physical duties. She's not doing them. You're having other technicians come over and do it for her. That's not an, quote, accommodation that the law requires. And number two, he found out that despite that, which was not a legal accommodation, she was working outside of her restrictions anyway, which, again, the company was not legally required to permit her to perform physical tasks that might injure her or endanger the patients, given her restrictions. And so what did they do? They met several times. This is not disputed in the record. They met. He, Akram, the HR person and the risk management person met several times. They thought about the demands of the job. They thought about what accommodations could be made. There just was no accommodation that would enable her to do the lifting, the standing, the stooping, the crouching. No reasonable accommodation.  Okay, so in that case, forgive me for interrupting, but so your response, I guess, to Hayden's statement, which I just paraphrased, my hope is we can show the business no longer supports these accommodations, is that he was what? He was using the word accommodations loosely or not in a legal sense, or what do we do with this? Yeah, so Hayden, he's not a lawyer, okay? So when he uses the word accommodations, he's not using it in the legal sense. But what he had in front of him was what the manager, the clinic manager, Akram, gave him. So she showed him what they had been doing for this lady. She also showed him what her restrictions were. Hayden had been in this business for 20 years. He knew full well what a patient care technician needed to do. He didn't need a lot of educating on that. He knew what they were required to do. And when he saw that, he said, and look, could he have phrased this in a more kindly way, I guess? Yeah, he could have. But the gist of it was what you have been doing and what she has been doing is not reasonable. It impedes patient care. It is dangerous to allow her to ignore her restrictions. And we should not be required when we're running at a loss, when we're losing money, to have a patient care technician that's either having other patient care technicians take over part of her duties, her essential duties, or giving her make work. She was sometimes doing special projects, administrative work, that was not within the job description of a patient care technician. It was just to keep her on the job. And when they went into mitigation, he said, you know, we just can't afford to have a patient care technician that can't really do the job of a patient care technician. And so they, and then, to kind of close the loop on this, if I may, they then also, Akram made some calls to see if other, because counsel's right, there are other clinics in the area. She made some calls to see if there might be an administrative position or something else that she could be transferred to. And the human resources person, Ms. Battles-Singleton, Rana, I believe, I'm probably butchering her name, she made a call to at least the clinic in Van Nuys, which I believe is in the valley. I'm not from this area. And so she made a call, and they just were not able to locate a vacancy that she could perform. And at that point, they simply told her, we're sorry, there's nothing for you here as a patient care tech, and we can't find a vacancy that you could perform. And so then they wrote her that letter, the March, I think it's 16th or March 18th letter, giving her these three options. Those three options were really, they really didn't have to do that at that point. I mean, at that point, they knew she couldn't be reasonably accommodated, and there was no vacancy to transfer her to. End of story. Under California law, I'm going to butcher the name of the case, the Scotch case and the Charanen case, if there is nothing available, then the criticisms of the interactive process and all of that, as Judge Fitzwater mentioned, that all falls away as a matter of law. There has to be something that would come out of that process, and there wasn't because there was no position available. Counsel, what's your position on whether if management at a sufficiently high level knew what was occurring with the accommodating and let it go, that that might be indicative that management viewed it as a reasonable accommodation because they allowed it to go on, as opposed to simply peers sort of working it out on the fly? Yeah. The answer, Your Honor, is that is not some type of a waiver. There are cases, and we cited to them, there's a Matkovich case, there's a California appeals case called Raine, R-A-I-N-E, that say just because you might give a person some temporary real nice accommodations that are more than you would need to give them, that doesn't commit you as an employer to give those accommodations permanently. You're not required to permanently absolve somebody of the essential functions of their job. But would it create a fact issue as to whether those accommodations were reasonable if a sufficiently high level of management knew of it and allowed it to go on? I don't think so, Your Honor, although on the record here, there is no indication that anyone high up in management knew of what was going on at this clinic. There was, and I think this is in the record, kind of a revolving door of the lower level clinic managers. Ms. Akram was the most recent clinic manager. They were the ones that were kind of muddling through with this lady, but again muddling through in a way that was absolving her of the essential duties of her job, which the employer is not required to do as a matter of law. It looks like I have a couple minutes left. I just wanted to mention on the retaliation claim, the legitimate business reason that we articulated for that is basically the same reason as would dispose of the disability claim, so I don't think I have to repeat that. We did cite law that says that the burden on pretext is pretty severe for the plaintiff. They have to identify specific and substantial evidence, and that's in the Lucent Technologies case, the Ninth Circuit case. I'll also say that the Scotch case, which is a California case, also cited to that same pretext standard when looking at a state law disability claim in California, and that specific and substantial evidence must quote, and I'm going to quote here, demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's explanation that a reasonable fact finder could rationally find them unworthy of credence. Plaintiffs kind of have levels of shotgun attack on a number of things here. None of them are the kind of specific and substantial evidence that shows that the explanation here doesn't hold up. The explanation is simple. It's consistent. It's coherent. There's nothing they did that would raise an issue of pretext. Anything further? I don't believe so. Thank you for your argument. Thank you. We'll hear from opposing counsel. If you're talking, you're muted. We can't hear you. Apologies. That's all right. Thank you. Just a couple quick points. First of all, in terms of going back to, you know, that the counsel made a reference to financial situation, profitability, and so on in the decision-making process. But Hayden specifically denied that finances had anything to do with the decision. If you look in the record, in the third volume of the excerpts at page 460, Hayden was asked, did finances have anything to do with whether Ms. Calderon could be accommodated or not? Answer, absolutely not. Page 461, he said, was there any financial hardship in accommodating Ms. Calderon? Answer, no. So the idea that finances had anything to do with this is contradicted by Hayden's own decision. In terms of re-counsel's very creative restating of Hayden's statement, well, it just contradicts what he said. He didn't say that. None of the statements that counsel put in Hayden's mouth are on the record as to what he said. And then, finally, I just want to make one more point. I know I'm almost out of time, but in terms of finding the job, Spitzer v. Good Guys, Inc., and it's not satisfactory to just say, oh, check online, call a number, check the hotline. That sort of thing is not sufficient under California law. With that, I'll submit. Thank you both for your helpful argument and careful preparation. We'll take this case under advisement and go on to the final case on the calendar for today.
judges: BYBEE, CHRISTEN, Fitzwater